IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

MATTHEW WARREN BRIGHT,  :
                                     :
     Plaintiff,             :
                                       :     CIVIL ACTION
v.                            :     No. 5:23-CV-447 (CAR)
                                       :
THE MEDICAL CENTER NAVICENT :
HEALTH,                     :
                                       :
                                     :
     Defendant.           :
_____:

## <u>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

*Pro se* Plaintiff Matthew Warren Bright asserts employment discrimination and retaliation claims under Title VII against the Medical Center Navicent Health ("Navicent"). Bright claims Navicent unlawfully terminated him based on his race for failure to comply with Navicent's "hair height policy"—a policy Plaintiff claims results in disparate impact to African Americans—and in retaliation for his complaint the policy was discriminatory. Navicent now moves for summary judgment on Plaintiff's claims. Having considered the relevant facts, applicable law, and the parties' briefs, Defendant's Motion for Summary Judgment [Doc. 21] is **GRANTED.**[1]

## LEGAL STANDARD

---

[1] Navicent's Partial Motion to Dismiss [Doc. 16] is **MOOT**.

Summary judgment is proper if the movant "shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."[2] Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.[3] This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[4]

On summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party; the Court may not make credibility determinations or weigh the evidence.[5] The moving party "always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[6] If the moving party discharges this burden, the burden then shifts to the nonmoving party to respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence creates a genuine issue of material fact or that the

---

[2] Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[3] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).
[4] *See id.* at 249-52.
[5] *See id.* at 254-55; *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).
[6] *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).

moving party is not entitled to a judgment as a matter of law.[7]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[8]

As a *pro se* litigant, Plaintiff is held "to a less stringent standard than formal pleadings drafted by lawyers."[9] Nevertheless, Plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law," including those applicable on summary judgment.[10]

## BACKGROUND

On February 1, 2016, Navicent hired Plaintiff as a Patient Account Specialist III within Navicent's Patient Access Department.[11] This position required frequent in-person interaction with patients and required Plaintiff to "promote[ ] patient safety" and "compl[y] with departmental and organizational policies and procedures."[12] On April 18, 2020, Navicent promoted Plaintiff to Navigation Specialist Team Lead where he was "[a]ccountable for accurate and timely registrations, charge posting and cash posting."[13] He continued to have direct patient contact and was again expected to comply with Navicent's policies and procedures.[14]

---

[7] *See* Fed. R. Civ. P. 56(e); *see also Celotex,* 477 U.S. at 324-26.

[8] *Avirgnan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

[9] *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

[10] *Hillemann v. Univ. of Cent. Fla.*, 411 F. Supp. 2d 1354, 1358-59 (M.D. Fla. 2004), *aff'd* 167 F. App'x 747 (11th Cir. 2006) (internal quotation marks omitted).

[11] Pl. Depo., pp. 15-18 [Doc. 21-2].

[12] *Id.* at p. 18.; Patient Account Specialist III Job Description, p. 1 [Doc. 21-2, p. 123].

[13] Navigation Specialist Team Lead Job Description, p. 1 [Doc. 21-2, p. 129].

[14] Pl. Depo., p. 20.

At all relevant times, Navicent maintained Personal Appearance Guidelines ("Guidelines"). The Guidelines provided in pertinent part:

> B. Hair
> Hair shall be kept clean, neatly trimmed and may not cover the teammate's eyes.
> • For teammates involved in patient care, or who have patient interaction, any hair that is past shoulder length must be secured and held back for safety and infection control.
> • Extreme hairstyles such as excessive teasing (over 2" in height), mohawks or extreme hair coloring are not acceptable. Hair color must be a neutral shade.[15]

The Guidelines warned that "[v]iolations of the Personal Appearance Guidelines may result in disciplinary action up to, and including, end of employment."[16]

The Guidelines "were implemented to support critical operational needs, including maintaining infection control and reducing the risk of contamination in patient care areas, particularly where employees have direct patient contact."[17] They "reflect well-established industry standards and were adopted to ensure consistent expectations across all Navicent facilities. [They] are directly related to maintaining a professional appearance, ensuring patient safety, and supporting infection control in a healthcare environment, and are consistent with business necessity."[18]

---

[15] Personal Appearance Guidelines, p. 5 [Doc. 21-2, p. 138].

[16] *Id.* at p. 1 [Doc. 21-2, p. 134].

[17] Key Decl., ¶ 6 [Doc. 21-2].

[18] *Id.* at ¶ 7.

Plaintiff, an African American male, "occasionally w[ore] [his] natural hair in an afro hairstyle" which he acknowledges "exceed[ed] the 2-inch maximum listed in this policy[.]"[19] On January 8, 2021, Plaintiff met with his supervisor, Elizabeth Edwards, Navicent's Patient Access/Financial Clearance Manager.[20] Edwards showed Plaintiff a photo of security camera footage from the emergency room "that showed [him] with [his] hair out."[21] She told him that someone with infection control had reviewed the security footage and reported Plaintiff's hair as a safety concern.[22] Thus, Edwards told Plaintiff he "could not report back to [his] work shift … with [his] hair out of compliance" with Navicent's Guidelines.[23] Edwards told Plaintiff he could go talk to Human Resources, but he "needed to take care of [his] hair … before [he] could come back to [his] next work shift."[24] Plaintiff understood that to comply with the Guidelines, he needed to "pull [his hair] back … [a]nd have [his] beard cut before [he] could come back to work."[25]

Before January 8, 2021, Plaintiff had been counseled "at least five times" about his failure to comply with the Guidelines.[26] On those previous occasions, when he was counseled about his hair height, Plaintiff complied by pulling his hair back.[27] Plaintiff did

---

[19] Jan. 21, 2021 email from Plaintiff to Angela Free [Doc. 21-2, p. 150].
[20] Pl. Depo., p. 35.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.* at p. 36.
[25] *Id.* at p. 37.
[26] *Id.* at p. 42.
[27] *Id.* at pp. 43, 45.

not think it was a "big deal" whether his hair complied with the Guidelines because he worked the overnight shift, so others did not see whether he complied.[28] But after infection control got involved, Plaintiff acknowledged that his supervisor was "getting … pressure" to make Plaintiff comply with the hair policy.[29]

Plaintiff was next scheduled to work the evening of January 8, 2021, but he did not report to work because he "felt like the policy was discriminatory" and thus was unwilling to pull his hair back and comply with the Guidelines.[30] He did not inform his manager that he would not be coming in to work.[31] Plaintiff also did not report to work for his next two scheduled shifts on January 9th and 10th.[32]

On January 12, 2021, Plaintiff spoke with Elaine Dorman, Navicent's Employee Relations Specialist at the time.[33] Plaintiff explained to Dorman that he believed the requirement to bind one's hair applied only to hair that extended past the shoulders, and because his natural hair did not extend past his shoulders, he did not have to bind it.[34] Plaintiff states Dorman told him that he would have to "cut [his] hair to the 2 inch mark in order to wear [his] afro."[35] Plaintiff acknowledged that when he previously complied

---

[28] *Id.* at p. 42.
[29] *Id.* at pp. 41-42.
[30] *Id.* at p. 37.
[31] *Id.* at p. 38.
[32] *Id.* at p. 39.
[33] *Id.* at pp. 43-45; Key Decl. ¶ 11.
[34] Pl. Depo. at p. 45.
[35] Jan 12, 2021 email to Free [Doc. 21-2, p. 150]; Pl. Depo., p. 44

with the hair-height policy, he never had to cut his afro; to comply, he needed to bind his

hair back.[36]

That evening, Plaintiff sent an email to Angela Free, Navicent's Human Resources

Benefit Manager at the time, wherein he complained that the hair height policy

"indirectly discriminates against African Americans" because "[m]ost African American

hair naturally grows 'up & out' while most Caucasian hair naturally grows 'straight &

down.'"[37] Plaintiff complained that the policy "restricts [African Americans'] natural hair

in length while there is no length restriction for a Caucasian's natural hair."[38]

Two days later, on January 14, 2021, Plaintiff met with Elizabeth Edwards, his

supervisor; Candice Spicer, Navicent's Patient Access Director; and Teresa Walston, an

Employee Relations Specialist.[39] Plaintiff was provided with an Employee Memorandum

of Record (the "Memorandum") that listed multiple infractions he incurred since January

8, 2021. The Memorandum was read aloud to him and warned him if he failed to comply

with the hair height policy, he would be discharged.[40] The Memorandum stated, in

pertinent part:

> Over the past two years, Matthew's manager has spoken to him on at least
> 4 or more occasions citing his hair and facial hair was outside of our
> Personal Appearance Standards and he needs to adhere to the policy.
> Plaintiff works in the Emergency Center and the director has complained
> to Elizabeth [Plaintiff's manager] that Matthew was not in compliance

---

[36] Pl. Depo., p. 44.
[37] Jan. 12, 2021 email to Angela Free [Doc. 21-2, p. 150].
[38] *Id.*
[39] Pl. Depo., p. 58; Key Decl. ¶ 11.
[40] Pl. Depo., p. 58; Jan. 14, 2021 Memorandum [Doc. 21-2, pp. 152-53].

related to his hair and bears; each time, Elizabeth spoke to Matthew about this matter.

Matthew's manager Elizabeth Edwards met with him on 01/08/2021 regarding hair and facial hair length. This was a result of the Infection Prevention Manager bringing a concern to Candice Spicer, the department director. Matthew was advised of the hospital Personal Appearance Guidelines for the organization. Matthew was advised to comply on the next scheduled shift. Friday 01/08/2021 Matthew was scheduled to work at 11:00 p.m. Matthew did not show up for work or make his manager aware of his absence. Matthew spoke to staff and informed team members to work overtime in his absence. Matthew did not report to work for three consecutive days due to not cutting facial hair to one inch or pulling hair back to not exceed two inches in height. Matthew is being counseled today regarding the following infractions:

- Refusal to perform assigned duties or to obey instructions – Insubordination
    1.  Not adhering to the Personal Appearance Guidelines
    2.  Failing to receive permission from management to assign overtime
    3.  Returning to the unit after being informed by his supervisor not to return until he followed our dress code- this occurred on 1/11/2021 – midnight to 3 AM and on 1/12/2021 around 3:15 pm
    4.  Returning to the unit yet again on 1/13/2021 around 4:00 pm after being informed by Candice Spicer on 1/13 that he was not to return to the workplace until she met with him. Additionally, Elizabeth witnessed that while Matthew was on the premises, he was printing out copies of documents and/or emails.
- Failure to adhere to our Core Values of integrity, respect, ownership and caring
    1.  Discussing with teammates matters which should be discussed on a leadership level
- Violation of Operation Excellence standards related to dress code.

In sum, the infractions above are not consistent with Navicent Health Inc. values and do not demonstrate strong leadership. As such, Matthew will be demoted from the Team Lead position and placed on 12-month probation.

> Matthew is expected to comply with the personal appearance policy effective immediately. Matthew understands that if he fails to comply and maintain our appearance guidelines (dress code) by Monday, January 18, 2021, he will be discharged.

Plaintiff understood that he could comply with the hair height requirement by pulling his back.[41] And Plaintiff understood that failure to comply by January 18, 2021, would result in his termination.[42]

On January 18, 2021, before Plaintiff reported to work for his shift, he informed Edwards and Spicer that he would comply with the facial hair length requirement, but he refused to comply with the hair height requirement.[43] Spicer reiterated that compliance with both requirements was mandatory.[44] When Plaintiff reported to work for his shift, his beard was in compliance with the Guidelines, but his hair was not.[45] Thus, Plaintiff was terminated.[46] At the time of his termination, Plaintiff understood his failure to bind his hair was the reason for his discharge.[47]

After exhausting his administrative remedies, Plaintiff filed suit against Navicent asserting its grooming policy is racially discriminatory and that its application to him

---

[41] Pl. Depo., p. 53 ("Q: D[id] you understand this meant for you to comply with the hair height requirement of the policy, all you had to do was pull your hair back? A: Uh-huh (affirmative). That is correct.")

[42] *Id.* at p. 65 ("Q: [W]as it your understanding at the time that if you returned to work on January 18, 2021, without being in compliance with the personal appearance guidelines, you could be terminated? A: Yes, ma'am.").

[43] *Id.* at pp. 66-70.

[44] *Id.* at p. 70.

[45] *Id.* at p. 66.

[46] *Id.* at pp. 70-71.

[47] *Id.* at p. 72.

constituted unlawful disparate treatment based on race, the policy results in unlawful disparate impact on African Americans, and Navicent terminated him in retaliation for complaining about the alleged discriminatory nature of the policy. Defendant moves for summary judgment on all claims.

## DISCUSSION

Disparate Treatment

As an initial matter, to the extent Plaintiff asserts Navicent's hair policy is facially discriminatory, such claim fails. "Facial discrimination occurs when an employer adopts a policy that explicitly treats some employees differently from others on the basis of race, religion, national origin, or gender (pregnancy)."[48] Navicent's policy forbids employees of all races from wearing "[e]xtreme hairstyles such as excessive teasing (over 2" in height), mohawks or extreme hair coloring" at work. Because Defendant's policy is neutral on its face, *i.e.,* it "does not by its terms apply exclusively to a protected group," "a claim of disparate treatment based on facial discrimination cannot be maintained."[49]

Plaintiff also cannot prevail on his claim that his termination constituted unlawful disparate treatment. Title VII's "disparate treatment" provision provides, in relevant part, that it is "unlawful" for an employer to "discharge … or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges

---

[48] *Id.*

[49] *Flowers,* 33 F.3d at 1313.

of employment, because of such individual's race…."[50] "To prevail on a disparate treatment claim, a Title VII plaintiff must demonstrate that an employer intentionally discriminated against h[im] on the basis of a protected characteristic."[51]

Navicent first argues Plaintiff's disparate treatment claim is foreclosed under Eleventh Circuit precedent because Plaintiff's discharge was not based on an immutable characteristic of his race. The Court agrees. Navicent's grooming policy, applicable to employees of all races, is race neutral. It does not prohibit its employees from having an afro, which Plaintiff alleges is an immutable characteristic because his hair naturally grows vertically. The policy limits the height which all employees' hair may extend to two inches. Plaintiff was not discharged because of an immutable characteristic (his natural afro); he was discharged because of his failure to bind his natural hair, which extended beyond the height limit of the policy. An employment policy that limits hair height, like hair length, does not discriminate on the basis of an immutable characteristic.

The Eleventh Circuit "held in *Willingham* that '[e]qual employment opportunity' which was the purpose of Title VII, 'may be secured only when employers are barred from discriminating against employees on the basis of immutable characteristics, such as race and national origin.'"[52] An employment "policy that distinguishes on some other

---

[50] 42 U.S.C. § 2000e-2(a)(1).

[51] *E.E.O.C. v. Catastrophe Mgmt. Solutions*, 852 F.3d 1018, 1024 (11th Cir. 2016) (citing *Ricci v. DeStefano*, 557 U.S. 577 (2009)).

[52] *E.E.O.C. v. Catastrophe Mgmt. Solutions*, 852 F.3d 1018, 1028 (11th Cir. 2016) (quoting *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084, 1091 (5th Cir. 1975) (*en banc*)).

ground, such as grooming or length of hair, is related more closely to the employer's choice of how to run his business than the equality of employment opportunity."[53] Title VII 'focuses its laser of prohibition' on discriminatory acts based on matters 'that are either beyond the victim's power to alter or that impose a burden on an employee on one of the prohibited bases.'"[54]

Hair height, like hair length, is mutable. Plaintiff had the power to alter his hair height, which he, in fact, did on at least four prior occasions when he bound his natural afro to bring his hair in compliance with the policy. A termination based on hair height is not a termination based on race. Because Plaintiff contends Navicent discriminated against him due to a mutable characteristic, his claim is not actionable under Title VII.[55]

Even if Plaintiff's claim is properly actionable under Title VII, it still fails because no evidence shows Navicent selectively enforced its race-neutral policy, implemented the policy in a discriminatory fashion, or terminated him because of his race. Plaintiff does not argue, nor does the record contain, any direct evidence of discrimination. Absent direct evidence, Plaintiff must rely on circumstantial evidence under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green.*[56] Under this framework, a plaintiff must first establish a *prima facie* case by establishing "facts adequate to permit

---

[53] *Id.* (quoting *Willingham*, 507 F.2d at 1091).
[54] *E.E.O.C. v. Catastrophe Mgmt. Solutions*, 852 F.3d 1018, 1029 (11th Cir. 2016) (quoting *Garcia.*
[55] *See Williams v. Georgia Dep't of Corrections*; Case No. 1:13-CV-3084-WSD, 2014 WL 3956039, at *3-4 (N.D. Ga. Aug. 13, 2014) (dismissing race discrimination claim based on grooming policy regulating hair length because hair length is not an immutable characteristic).
[56] 411 U.S. 792 (1973); *see Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).

an inference of discrimination."[57] If the plaintiff establishes his *prima facie* case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its adverse employment action.[58] If the employer meets this "exceedingly light" burden, then the inference of discrimination is erased, and the burden shifts back to the plaintiff, who must show that the employer's proffered reasons were merely pretext for discrimination.[59] Importantly, the ultimate burden of persuasion remains on the plaintiff at all times.[60]

To establish a *prima facie* case of discriminatory discharge under Title VII, Plaintiff must generally show he (1) is a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly situated individual outside his protected class or was replaced by a person outside of his protected class.[61]

No evidence shows Navicent treated similarly situated employees outside of Plaintiff's protected class more favorably than he was treated. "To satisfy the fourth element of the *McDonnell Douglas* prima facie case, a plaintiff must show that he and his comparators were 'similarly situated in all material respects.'"[62] "Although this is a case-

---

[57] *Holifield v. Reno*, 115 F.3d 1555. 1562 (11th Cir. 1997).

[58] *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).

[59] *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

[60] *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

[61] *See, e.g., Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

[62] *Blash v. City of Hawkinsville*, 856 F. App'x 259, 264 (11th Cir. 2021) (quoting *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc)).

specific inquiry, a similarly situated comparator ordinarily will have: (1) engaged in the same basic conduct or misconduct; (2) been subject to the same employment policy, guideline, or rule; (3) had the same supervisor; and (4) shared a similar employment or disciplinary history."[63] "[T]he quantity and quality of the comparator's misconduct must be nearly identical [to the plaintiff's] to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."[64] "The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."[65]

Plaintiff points to an unnamed Caucasian female nurse as a purported comparator who had hair that extended past her shoulders.[66] But he testified that due to the length of her hair, she was required to bind it, and she complied.[67] Because she complied with the policy, unlike Plaintiff who was terminated because he failed to comply with the policy, she is not a valid comparator. Indeed, Plaintiff's testimony shows that Navicent applied the grooming policy uniformly. Plaintiff admits he is unaware of anyone whose hair exceeded the threshold of the hair policy and failed to comply.[68] The record does not contain any evidence of discriminatory intent.

Even if Plaintiff could establish a *prima facie* case of discrimination under Title

---

[63] *Id.*

[64] *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999); s*ee also Burke-Fowler*, 447 F.3d at 1323.

[65] *Rioux v. City of Atlanta, Ga.,* 520 F.3d 1269, 1281 (11th Cir. 2008).

[66] Pl. Depo, p. 47.

[67] *Id.*

[68] *Id.* at p. 49.

VII, Navicent has articulated legitimate, nondiscriminatory reasons for terminating Plaintiff—his failure to comply with the Guidelines. Thus, to survive summary judgment, Plaintiff must present sufficient evidence to create a genuine issue of material fact that Navicent's reason is merely pretext for unlawful race discrimination. Plaintiff has failed to meet this burden. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions."[69]

To establish pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that reasonable factfinder could find them unworthy of credence."[70] Plaintiff fails to show any evidence Navicent's legitimate, nondiscriminatory reason for his termination was pretextual. Thus, Navicent is entitled to summary judgment on Plaintiff's disparate treatment claim.

Disparate Impact

Plaintiff also asserts that Defendant's policy has a disparate impact on African Americans. "A disparate impact claim targets an employment practice that has an actual,

---

[69] *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (quotations and citation omitted).
[70] *Jones v. Gulf Coast Health Care of Del., LLC*, (11th Cir. 2017) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

though not necessarily deliberate, adverse impact on protected groups."[71] Disparate impact claims challenge "practices that have a disproportionately adverse effect on [a protected group] and are otherwise unjustified by a legitimate rationale."[72] The disparate impact provision in Title VII makes it unlawful for an employer to "limit, segregate, or classify his employees … in any way which would deprive … any individual or employment opportunities … because of such individual's race[.]"[73] To establish a prima facie case of disparate impact, a plaintiff must (1) "identify the specific employment practice that allegedly has a disproportionate impact"; and (2) "establish causation by offering statistical evidence sufficient to show that the practice in question has resulted in prohibited discrimination."[74]

Plaintiff offers no statistical data or any other factual support linking the Guidelines to a racial disparity. Plaintiff's conclusory assertion that the Guidelines "racially discriminated against him and African Americans (in general)" is insufficient. Even if Plaintiff could establish a *prima facie* case of disparate impact, his claim fails because he cannot rebut Navicent's explanation that the Guidelines "serves a legitimate, non-discriminatory business objective."[75] The Guidelines serve a legitimate, non-discriminatory business practice, as they were implemented to establish system-wide

---

[71] *E.E.O.C. v. Catastrophe Mgmt. Solutions*, 852 F.3d 1018, 1024 (11th Cir. 2016) (citing *Ricci*, 557 U.S. at 577)).

[72] *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 524-25 (2015) (internal quotations omitted).

[73] 42 U.S.C. § 2000e-2(a)(2).

[74] *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1314 (11th Cir. 1994).

[75] *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1275 (11th Cir. 2000).

personal appearance standards, promote workplace safety, and to maintain infection control standards in accordance with healthcare industry practices.[76] Excessive hair length that is not pulled back can cause problems for patients in sterile environments.[77] Thus, Navicent is entitled to summary judgment on Plaintiff's disparate impact claim.

<u>Retaliation</u>

Finally, Plaintiff asserts Navicent terminated him in retaliation for complaining that the Guidelines were discriminatory against African Americans, in violation of Title VII. Because the evidence is circumstantial, the *McDonnell Douglas* burden-shifting framework detailed above applies to Plaintiff's retaliation claims, although the elements of the *prima facie* case differ. "[T]o successfully allege a *prima facie* retaliation claim under Title VII, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression."[78]  "Once a *prima facie* case has been established, the [employer] may come forward with legitimate reasons for the employment action to negate the inference of retaliation."[79] If the employer is able to show legitimate reasons for the adverse employment action, the burden shifts back to the employee to

---

[76] Key Decl. ¶¶ 6 & 7.
[77] *Id.*
[78] *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (citations omitted).
[79] *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310-11 (11th Cir. 2016) (citations omitted).

demonstrate by a preponderance of the evidence that the employer's reasons are pretextual.[80]

Assuming Plaintiff's complaint on January 12, 2021, that the Guidelines were discriminatory constitutes protected activity,[81] Navicent is nevertheless entitled to summary judgment because Plaintiff fails to establish a genuine issue of material fact that his termination was caused by his complaint as opposed to his failure to adhere to the hair policy. Plaintiff argues the close temporal proximity between his complaint on January 12, 2021, and his termination six days later on January 18, 2021, establishes a genuine issue of material fact that his termination was retaliatory. Plaintiff is correct that "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action."[82] But Navicent warned Plaintiff on January 8, 2021, four days before Plaintiff complained that he believed the Guidelines were discriminatory, that he could not return to work until he complied with the hair policy. "[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity,

---

[80] *Id.*

[81] The Eleventh Circuit has held that an employee's belief that grooming standards are discriminatory cannot be objectively reasonable because the employee is presumed to know that grooming standards governing length of hair like the one at issue in this case are not discriminatory. *See Harper v. Blockbuster*, 139 F.3d 1385, 1389 (11th Cir. 1988) ("The plaintiffs chose to protest Blockbuster's grooming policy despite the existence of long-standing precedent holding that such a policy was not discriminatory. No decision cited by the plaintiffs has supplanted the reasoning or called into question the conclusions set forth in that binding precedent. Therefore, we hold that the plaintiffs could not have had an objectively reasonable belief that Blockbuster's grooming policy discriminated against them on the basis of their sex.").

[82] *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citation omitted).

temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation."[83]

The record makes clear Plaintiff's reprimand on January 8, 2021, demotion on January 14, 2021, and termination on January 18, 2021, were not retaliatory, but instead were consequences of his repeated and acknowledged failure to comply with the Guidelines – a policy he was aware of, had been previously warned about, and in which he previously complied with on multiple occasions. At the time of his termination, Plaintiff admitted he "was not in compliance with the … policy" and understood "if [he] did not bind [his] hair that [he] would be discharged."[84] Plaintiff also admitted that Infection Control was beginning to pressure his supervisor which led to the warning on January 8, 2021, that he would not be permitted to return to work unless he complied with the hair policy. Plaintiff admitted "this was a different approach that they had never taken as far as telling [him] that [he] couldn't report to work," and he recognized that policy violations "could terminate" his employment.[85] Because his termination was contemplated before his complained, Plaintiff cannot maintain his retaliation claim, and Navicent is entitled to summary judgment.

---

[83] *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006); *see also Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006) ("When an employer contemplates a given action before the harassment takes place, temporal proximity between the action and the incident of harassment alone will not suffice to show causation."); *Gooden v. Internal Revenue Serv.*, 679 F. App'x 958, 968 (11th Cir. 2017) (holding that certain conduct cannot be retaliatory because it occurred before the plaintiff engaged in protected activity).
[84] Pl. Depo., pp. 66 and 72.
[85] *Id.* at pp. 60 and 50.

**CONCLUSION**

For the reasons stated herein, Defendant's Motion for Summary Judgment [Doc. 21] is **GRANTED.**[86]

**SO ORDERED,** this 25th day of September, 2025.

s/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

[86] Navicent's Partial Motion to Dismiss [Doc. 16] is **MOOT**.